UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

ALLAN P. ZITTA and TRACY ZITTA,    )
                                       )
           Plaintiffs,         )
                                       )
           v.               )          Case No. 1:12-cv-160-jgm
                                       )
ANDREW GRAHAM, ALAN F. BUCK    )
and the TOWN OF RICHMOND,       )
                                       )
           Defendants.      )

MEMORANDUM AND ORDER
(Docs. 32, 33)

I.      Introduction

This is a case about a fork lift truck known as the "Lull."  Defendants Andrew Graham,

Alan F. Buck, and the town of Richmond have all moved for summary judgment.  (Docs. 32, 33.)

Plaintiffs Allan and Tracy Zitta have opposed the motion and Defendants have filed reply

memoranda.  (Docs. 37, 38, 43, 44.)  For the following reasons, Defendants' motions are

GRANTED and this action is DISMISSED.

II.      Factual Background[1]

Tracy and Allan Zitta have lived at 158 Wes White Hill Road in Richmond, Vermont since

November 2010.  (Doc. 8 at 1; Doc. 32-3 at 4.)  Before moving in, the Zittas hired Charles

Waterman, Mr. Zitta's "friend" from Seabrook, Massachusetts, to build a barn on the property.

---

[1] Except where otherwise indicated, the following facts are undisputed.  Local Rule 56(b)
requires a party opposing summary judgment to "provide a separate, concise statement of disputed
material facts."  D. Vt. L. R. 56(b).  Plaintiffs did so but also filed their own "Statement of
Undisputed Material Facts."  (Doc. 39.)  This Court has repeatedly reminded litigants that "the Local
Rules do not provide an opportunity for the nonmoving party to file a statement of <u>undisputed</u> facts
at the summary judgment stage."  <u>Rotman v. Progressive Ins. Co.</u>, 5:12-cv-67, 2013 WL 3293531, at
*1-2 (D. Vt. June 28, 2013) (citing cases).  The Court has nevertheless, in its discretion, conducted its
own review of the record, <u>see</u> <u>Holtz v. Rockefeller & Co.</u>, 258 F.3d 62, 73 (2d Cir. 2001), but does
not cite to Plaintiffs' "Statement of Undisputed Material Facts."

(Doc. 32-2 ¶¶ 1-3; Doc. 38-17 at 2.)  Waterman lived in the Zitta's house during construction of the barn from August to November 2010, and the Zittas moved in after its completion.  (Doc. 32-3 at 4.)  The Zittas then hired Waterman to build an addition to their house as well.  (Doc. 32-2 at ¶ 3.) From July 2011 to January 2012, Waterman lived in his camper on the Zittas' property and worked on the addition.  Id.

On March 23, 2012, when Allan Zitta was in Arizona at a shooting competition, Waterman knocked on the Zittas' door at approximately 7:30 p.m.  Id. ¶ 4.  Mrs. Zitta answered the door and the two spoke about scaffolding that Waterman had used to build the addition and remained on the property.  Id. ¶¶ 5-6.  Waterman told Mrs. Zitta he intended to pick up the scaffolding, but Mrs. Zitta said she did not think he owned it.  Id. ¶ 6.  Waterman said he did own the scaffolding along with the "Lull," a fork lift truck on the property.  Id.  Mrs. Zitta responded that he did not own the Lull, either.  (Doc. 32-3 at 14.)  Waterman then told Mrs. Zitta he needed to get paperwork in his truck that the Zittas might need for tax reasons, and would return in a few minutes -- apparently because he parked his truck on Wes White Hill Road, not in the Zittas' driveway.  (Doc. 32-2 at ¶ 7; Doc. 32-3 at 29.)

After about 10 minutes, Mrs. Zitta went outside to look for Waterman and saw him walking toward the scaffolding.  (Doc. 32-2 ¶¶ 8-9.)  At that point, Mrs. Zitta returned to the house called her husband in Arizona, but did not reach him.  Id. ¶ 9.  She then returned outside and saw Waterman driving the Lull toward the scaffolding.  Id. ¶ 10.  Waterman picked up the scaffolding with the Lull, moved it to a flat location, and cut it in half with a power saw.  Id.; Doc. 32-3 at 19. Mrs. Zitta returned to the house and was able to reach her husband on the phone.  (Doc. 32-2 ¶ 11.) She then went back outside and told Waterman he should not be there when Mr. Zitta was away. Id. ¶¶ 12-13.  Waterman told her to go ahead and call the police because he had already done so.

Id. ¶ 13.  Mrs. Zitta then called the police and spoke with Officer Andrew Graham, who was processing a person for driving under the influence ("DUI").  Id. ¶¶ 15-17.  Officer Graham said to Mrs. Zitta, "I know [Waterman] is there.  I already know the story.  And besides, you owe him money."  Id. ¶¶ 19-20.  Officer Graham had learned this information from speaking with Waterman on the phone.  Id. ¶ 20.  Officer Graham then said he would come to her house as soon as he could. Id. ¶ 19.

Waterman then drove the Lull onto Wes White Hill Road and loaded the scaffolding onto a trailer attached to his truck.  Id. ¶ 23.  He then prepared the trailer to load the Lull on it as well. Id. ¶ 24.  Mrs. Zitta chased him on foot and got into the Lull to try and drive it back onto her property, but Waterman grabbed the Lull's keys and locked himself in his truck.  Id. ¶ 25. Waterman then called Officer Graham back and told him Mrs. Zitta was "going ballistic" on him. Id. ¶ 26.  Officer Graham told Waterman to stay in his truck.  Id.  Mrs. Zitta also called Officer Graham, who similarly told her to stay in the house until he arrived.  Id. ¶ 29.  Mrs. Zitta returned to her house and again spoke with her husband on the telephone.  Mr. Zitta asked her to write down Waterman's license plate numbers, and she went back outside and did so.  Id. ¶ 30.

At approximately 9:15 p.m., as Mrs. Zitta was returning to the house, Officer Graham arrived along with Vermont State Trooper Phillip Glanz.  Id. ¶ 31.  Mrs. Zitta told the officers that Waterman was stealing the Lull and said he must have cut a chain that secured the Lull in order to drive it off the property.  Id. ¶ 32.  Waterman denied cutting any chain and told Officer Graham he owned the Lull.[2]  Id. ¶ 35.  He also showed Officer Graham a bill of sale stating that Dan Gallant

---

[2] In his deposition, Mr. Zitta stated he found pieces of the chain when he returned from Arizona and showed it to Officer Graham and Chief Buck.  (Doc. 38-4 at 9-10.)  According to Mr. Zitta, Officer Graham first told him he was not interested in the chain.  Id. at 10.  Mr. Zitta then stated Officer Graham arrived at the house and Mr. Zitta asked him why he let Waterman "do this." Id.  According to Mr. Zitta's deposition testimony, Officer Graham said something along the lines

sold Waterman a Lull for $12,000.  Id. ¶ 36.  Officer Graham determined that the serial number on

the bill of sale and the serial number on the Lull matched.  Id.  He then called Gallant, who said that

Waterman had indeed purchased the Lull.  Id.  Officer Graham asked Mrs. Zitta to produce any

documentation relating to ownership of the Lull, but she was unable to do so.  Id. ¶ 39.

Mr. Zitta then called Mrs. Zitta's cell phone and asked to speak to Officer Graham.  Id. ¶ 40.

When Mr. Zitta told Officer Graham that Waterman did not own the Lull, Officer Graham asked

Mr. Zitta if he had any documentation relating to ownership of the Lull.  Id. ¶ 41.  Mr. Zitta said

that he did not have any that he could "touch right now" and his wife would not be able to find any

paperwork either.  Id.  Officer Graham denied Mr. Zitta's request to impound the Lull.  Id. ¶ 41.

The parties dispute whether Waterman's purported bill of sale constituted actual "evidence of

ownership,"[3] but in any event, it was at this point that Officer Graham decided the situation was a

civil, not criminal matter.  Id. ¶¶ 42-43; Doc. 40 at 1; Doc 32-5 ¶ 19.  Based on what Waterman had

showed him, Officer Graham believed (and the Zittas dispute) that he did not have authority to

seize the Lull or prevent Waterman from leaving with the fork lift.  Id. at ¶ 42; Doc. 40 at 1; Doc 32-

---

of, "even if I was there, and the chain was on there, I would have cut the chain and let [Waterman]
take [the Lull]."  Officer Graham states in his deposition that that "was a poor choice of words on
[his] part" and he made the statement because Mr. Zitta was "quite irate with [him]" and "quite
angry."  (Doc. 38-5 at 8.)

[3] The Zittas allege Waterman created the bill of sale on March 20, 2013, three days before
he showed up at their house.  (Doc. 38 at 5-6.)  According to the affidavit of Dan Gallant,
Waterman leased the Lull from Gallant on August 15, 2010.  (Doc. 38-1 at 2.)  Gallant received
from Waterman $2,500 for the first month's rent and another $2,500 for the second month's rent.
Id.  In early October 2010, Waterman gave Gallant $12,500 in cash to purchase the Lull outright.
Id.  No paperwork was apparently exchanged (between either Waterman and Gallant or Waterman
and the Zittas), and Gallant did not hear from Waterman for approximately 17 months.  Id.  On
March 20, 2012, Waterman produced a "home made" bill of sale and asked Gallant to sign it, which
he did.  Id.  Gallant "regret[s] that [he] didnt [sic] date the bill of sale for the current date of March
20, 2012 when [he] signed it."  Id.

5 ¶ 19.  Trooper Glanz also thought it was a civil matter.  (Doc. 32-2 ¶ 43.)  Officer Graham then

told Mrs. Zitta he was "going to allow Waterman to leave."  (Doc. 32-5 ¶ 19).

Mrs. Zitta asked Officer Graham and Trooper Glanz to charge Waterman with trespassing,

but Officer Graham declined because Mrs. Zitta had not actually asked Waterman to leave the

property.  (Doc. 32-2 ¶ 44.)  The parties dispute whether Mrs. Zitta's actions gave Waterman

permission to be there.  (Doc. 40 at 1.)  Mrs. Zitta also told Officer Graham that Waterman's vehicle

and trailer exceeded Wes White Hill Road's weight limit.  (Doc. 32-2 ¶ 45.)  Officer Graham

responded that he did not have scales in his police cruiser needed to weigh the vehicles.  Id.  He

reiterated that it was a civil matter and then "did not stop Waterman from driving away" with the

Lull.  (Doc. 32-2 ¶ 46.)  According to Officer Graham, "[a]t no time did [he] conspire with

Waterman to deprive the Plaintiffs of the Lull or physically assist Waterman in removing the Lull."

Id.  The Zittas claim Officer Graham "gave permission to Waterman to drive away" and that

"Waterman has testified that Graham assisted him."[4]  (Doc. 40 at 2.)

On March 26, 2012, Richmond Chief of Police Alan Buck learned of the incident when he

read a shift summary.  (Doc. 32-2 ¶ 47.)  Mrs. Zitta met with Chief Buck that same day and

requested a copy of Officer Graham's police report, which Chief Buck provided.  Id. ¶¶ 48-49.

Chief Buck told Mrs. Zitta he had a copy of what appeared to be Waterman's bill of sale and like

Officer Graham, he believed that the disputed ownership of the Lull was a civil matter.  Id. ¶ 49.

Two days later, Mr. Zitta also met with Chief Buck and asked him to charge Waterman with stealing

---

[4]  Waterman did not actually testify that Officer Graham assisted him.  The Zittas have sued
Waterman in New Hampshire Superior Court to recover the Lull and Waterman apparently failed to
respond to the Zittas' requests for admission.  (Doc. 38-1 at 3-4.)  This has led the Zittas, armed
with facts "deemed admitted" by Waterman's failure to respond, to state Waterman "has testified
that Graham assisted him."  (Doc. 40 at 2.)  In his deposition in that case, Waterman responds "yes"
when asked by the Zittas' attorney if Officer Graham gave him permission to leave with the Lull.
(Doc. 38-9 at 6.)

the Lull.  Id. ¶ 52.  Chief Buck asked Mr. Zitta to produce documentation to prove he was the owner of the Lull, and Mr. Zitta showed him maintenance records.  Id.  Chief Buck had Officer Graham refer the incident to the State's Attorney's Office for review.  Id. ¶ 53.  In a letter dated April 9, 2013, Deputy State's Attorney Scott Willison declined to press criminal charges against Waterman.  Id.

At the time of the incident, Officer Graham had completed the basic training necessary to be a full-time law enforcement officer, as required by both the Vermont Criminal Justice Training Council and the town of Richmond.  Id. ¶ 57.  At the Vermont Police Academy (the "Academy"), Officer Graham was trained that in order to seize property, "it is necessary that he have probable cause to believe that the property is evidence or contraband and that he must have a warrant for the property or be able to establish that an exception to the warrant requirement applies."  Id. ¶ 60.  The Richmond Police Department has a similar search and seizure policy.  Id. ¶ 64.  Officer Graham also had training at the Academy in the distinction between civil and criminal matters.  Id. ¶ 61.  Based on this training, Officer Graham's understanding is that "civil cases are private disputes between individuals" and he has the "authority to investigate criminal matters, but not the authority to resolve civil matters."  Id.

At the time of the incident, Chief Buck had served as Richmond's police chief since 2011.  Id. ¶ 70.  Between 2009 and mid-2013, the Richmond Police Department (the "Department") carried out more than 7,000 motor vehicle stops and responded to over 5,000 service calls.  Id. ¶ 69.  There have been no lawsuits (other than this one) relating to alleged officer misconduct in Richmond since 2000.  Id. ¶ 71.  When a Department officer is called to a property dispute and "it is unclear as to who the real owner is," it is Department practice to advise the parties that the matter is civil in nature, not criminal.  Id. ¶ 63.  Officers may also refer the matter to the State's Attorney's

Office to make a determination as to the nature of the dispute.  Id.  If the property dispute rises into

"disorderly conduct or other criminal activity, officers are trained to respond appropriately."  Id.

According to Chief Buck, this practice is consistent with that of the Vermont State Police, where he

worked for over 32 years.  Id.; Doc. 32-7 ¶ 1.  Chief Buck has never been told that this practice is

"contrary to law or prevailing practice or that one of his officers has improperly concluded that a

particular matter was civil as opposed to criminal."  (Doc. 32-2 ¶ 63.)  The Department does not,

however, provide specific training to its officers about adjudicating property disputes, and Chief

Buck did not personally receive training in the difference between civil and criminal cases when he

was at the Academy.  Id. ¶ 62; Doc. 38-6 at 3.

III.    Discussion

    A.    Standard of Review

Under Federal Rule of Civil Procedure 56(a), a court must "grant summary judgment if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he district court must draw all factual

inferences in favor of, and take all factual assertions in the light most favorable to, the party

opposing summary judgment."  Coollick v. Hughes, 699 F.3d 211, 219 (2d Cir. 2012).  The moving

party "always bears the initial responsibility of informing the district court of the basis for its

motion," Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), but "[w]here the moving party meets

that burden, the opposing party must come forward with specific evidence demonstrating the

existence of a genuine dispute of material fact."  FDIC v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d

Cir. 2010).

Furthermore, "the mere existence of some alleged factual dispute between the parties will

not defeat an otherwise properly supported motion for summary judgment; the requirement is that

there be no <u>genuine</u> issue of <u>material</u> fact."  <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007) (quoting

<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986)).  In other words, "the non-moving

party must do more than simply show that there is some metaphysical doubt as to the material facts

. . . and may not rely on conclusory allegations or unsubstantiated speculation."  <u>FDIC</u>, 607 F.3d at

292 (internal quotation marks and citations omitted).  Summary judgment should therefore be

granted "[w]here it is clear that no rational finder of fact 'could find in favor of the nonmoving party

because the evidence to support its case is so slight.'"  <u>Id.</u> (quoting <u>Gallo v. Prudential Residential</u>

<u>Servs., Ltd. P'ship</u>, 22 F.3d 1219, 1224 (2d Cir. 1994)).

> B.      <u>Officer Graham</u>

The Zittas allege Officer Graham violated their rights under the Fourth and Fourteenth

Amendment because he "affirmatively intervened in a civil matter" by presiding over a "curbside

court" and then "assisted Mr. Waterman in wrongfully removing the Lull" from their property.

(Doc. 8 ¶¶ 33-34.)  They also claim Officer Graham violated Article 11 of the Vermont Constitution

and committed the common law tort of conversion.  <u>Id.</u> ¶¶ 39, 49.  As a preliminary matter, because

the Zittas' opposition memorandum does not address their conversion claim, the Court deems it

abandoned.  <u>See, e.g.</u>, <u>O'Brien v. Barrows</u>, 1:10-cv-173, 2013 WL 486655, at *5 (D. Vt. Feb. 7,

2013); <u>Pibouin v. CA, Inc.</u>, 867 F. Supp. 2d 315, 325-26 (E.D.N.Y. 2012) (citing cases).  The same

goes for their Fourth Amendment and Article 11 claims.  Beyond cursory mention of the Fourth

Amendment and Article 11, <u>see</u> Doc. 38 at 2, 7, the Zittas do not address -- let alone develop or

defend -- these legal theories.  The failure to respond to Officer Graham's motion on these issues

results in abandonment of the claims.  <u>See</u> <u>Taylor v. City of New York</u>, 269 F. Supp. 2d 68, 75

(E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary

judgment on one ground and the party opposing summary judgment fails to address the argument in

any way.").

The remaining claim against Officer Graham is rooted in the Fourteenth Amendment's

procedural due process protection, alleging his actions "deprived the Zittas of their protected

property interests [i.e., the Lull] without notice and without [a] hearing."  (Doc. 38 at 7.)  In deciding

this motion for summary judgment, "resolving all ambiguities and drawing all inferences in favor of"

the Zittas,[5] the Court finds the Zittas have "sufficiently established a property interest" in the Lull

"so that it cannot be taken by state action without notice and an opportunity to be heard."  Barrett

v. Harwood, 189 F.3d 297, 301 (2d Cir. 1999); see Pangburn v. Culbertson, 200 F.3d 65, 70 (2d Cir.

1999) (recognizing plaintiff's Fourteenth Amendment property interest "[d]espite lack of formal title

ownership").[6]  The Court will first address whether the facts show Officer Graham violated the

Zittas' constitutional rights when he permitted Waterman to leave with the Lull.

1.      Officer Graham's Conduct Did Not Constitute State Action

Under the Fourteenth Amendment, citizens enjoy the "right not to be deprived of property

by any state without due process of law," but that right "is violated only 'by conduct that may be

fairly characterized as state action.'"  Barrett, 189 F.3d at 301 (quoting Lugar v. Edmondson Oil Co.,

457 U.S. 922, 924 (1982)).  In this case Officer Graham could only have violated the Zittas'

---

[5]  It appears that the Zittas hired Waterman to work on their house, gave him $12,000 cash
to buy the Lull (which was needed to do the work), and were ultimately unsatisfied with the work.
See Doc. 38-17 at 2.  Waterman billed the Zittas for his work, subtracting from the total amount due
the amount the Zittas gave him to buy the Lull along with money Mr. Zitta provided for "Lull
parts."  (Doc. 38-12 at 2.)  The Zittas apparently did not pay him, see Doc. 31-18 at 9, and a couple
months later, Waterman came to pick up the Lull, leading to the events of March 23, 2012 and this
lawsuit.  According to a police report, the Zittas also claim Waterman bounced a $3,500 check in an
apparently unrelated transaction between Mr. Zitta and Waterman involving the sale of Harley
Davidson parts on eBay.  (Doc. 38-17 at 2.)

[6]  The Zittas do not claim to have formal title to the Lull.

constitutional rights if what he did constituted state action.  Officer Graham argues it did not.  The

state action doctrine "requires both an alleged constitutional deprivation caused by the exercise of

some right or privilege created by the State or by a rule of conduct imposed by the State or by a

person for whom the State is responsible, and that the party charged with the deprivation must be a

person who may fairly be said to be a state actor."  Fabrikant v. French, 691 F.3d 193, 206 (2d Cir.

2012) (internal quotation marks omitted).  The Zittas have sued under § 1983, where, in order "[t]o

establish a deprivation of property, a plaintiff must show that a person acting under color of any

state statute, regulation, custom or usage deprived plaintiff of a right secured by the Constitution."

Barrett, 189 F.3d at 301 (citing § 1983).  The state action requirement of the Fourteenth

Amendment and the "under color of state law" requirement of § 1983 are the same.  Lugar, 457 U.S.

at 929; see Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 n.2 (2001).

        First, as mentioned above, the Court assumes the Zittas have a property interest in the Lull

sufficient to trigger protection based on the due process clause of the Fourteenth Amendment.  And

second, the question here is not to determine whether Officer Graham is a state actor (he

undoubtably is) but whether his conduct reached "the point at which official involvement in an

otherwise private repossession is sufficient to constitute state action."  Barrett, 189 F.3d at 302;

see Yeomans v. Wallace, 291 F. Supp. 2d 70, 74 (D. Conn. 2003) (noting that a police officer's

"conduct is not automatically elevated to the level of state action.  One must examine the officer's

conduct, not merely his title, in order to determine whether there was state action.").  Thus, to

survive summary judgment, the Zittas must first show a genuine dispute as to a material fact

regarding whether Officer Graham's involvement in Waterman's repossession[7] of the Lull effectively

"converted a private repossession into state action."  Barrett, 189 F.3d at 301-02.

The Second Circuit has previously "discern[ed] a spectrum of police involvement at the

scene of a repossession" useful in determining whether particular involvement constitutes state

action.[8]  Id. at 302.  For starters, "a police officer's mere presence at the scene is insufficient."  Id.

(citing Wright v. Nat'l Bank of Stamford, 600 F. Supp. 1289, 1295 (N.D.N.Y. 1985), aff'd sub nom.

Wright v. Nat'l Bank of Stamford, 767 F.2d 909 (2d Cir. 1985)); see Dolan v. Cassella, 12-2486, 2013

WL 6150763 (2d Cir. Nov. 22, 2013) (summary order) (citing Barrett).  "Further along the spectrum

we find involvement greater than mere presence, yet still insufficient to constitute state action in aid

of the repossession."  Barrett, 189 F.3d at 302.  As an example of this level of involvement, the

Second Circuit cited Menchaca v. Chrysler Credit Corp., 613 F.2d 507, 510-12 (5th Cir. 1980).  In

that case, the Fifth Circuit found no state action where "[u]pon arrival at the scene, an officer

informed the debtor that 'repossession was a civil matter and that the only reason the police were

there was to quiet a reported disturbance.'"  Barrett, 189 F.3d at 302 (quoting Menchaca, 613 F.2d

at 510); see Ostensen v. Suffolk Cnty., 378 F. Supp. 2d 140, 149 (E.D.N.Y. 2005), aff'd, 236 F.

App'x 651 (2d Cir. 2007) (finding no state action because officer's "actions at the scene appear[ed]

to be an effort to keep the peace between the parties.  There is a distinction between a law

---

[7]  The Court, like the Zittas (Doc. 38 at 10 n.3), uses the term "repossession" in the descriptive sense only.  There is no evidence either Waterman or the Zittas had a security interest in the Lull.

[8]  Although the discussion of state action in Barrett and other cited cases is generally in the context of a creditor-debtor relationship inapplicable here, the Court finds that the underlying legal principles remain relevant for the purpose of establishing whether Officer Graham's conduct constituted state action.  The Zittas claim at one point in their opposition that "Waterman was the debtor," (Doc. 38 at 10), but do not provide any evidence to support that argument.  Indeed, in Waterman's answers to interrogatories in the Zittas' New Hampshire lawsuit against him, Waterman claims Allan Zitta owes him over $14,000.  (Doc. 31-18 at 9.)

enforcement officer attending a private seizure to ensure that it transpires in an orderly and peaceful manner and actively assisting in unlawful conduct.").

Finally, "[w]hen an officer begins to take a more active hand in the repossession, and as such involvement becomes increasingly critical, a point may be reached at which police assistance at the scene of a private repossession may cause the repossession to take on the character of state action," or at least permit a plaintiff to survive summary judgment on the issue. Barrett, 189 F.3d at 302. Examples of "critical" involvement tend to include threats of arrest or otherwise intimidating a plaintiff from interfering in a repossession that he or she has a right to contest. Id. (citing cases).

In the end, "the crucial question is whether the police officer was (1) present simply to stand by in case there was a breach of the peace, or (2) taking an active role that either affirmatively assisted in the repossession over the debtor's objection or intentionally intimidated the debtor so as to prevent him from exercising his legal right to object to the repossession." Id. at 302-03. In Barrett, the officer arrived at the scene of a repossession and witnessed the objector strike the repossessor. The officer told the objector that the repossession was a civil matter and that "if you start any trouble here, you'll be going in the back seat of my car." Barrett, 189 F.3d at 303 (brackets omitted). The Second Circuit found no state action and affirmed the district court's grant of summary judgment to the defendants because the officer's "actions amounted to no more than the carrying out of his duty to prevent violence in the event of a breach of the peace." Id. Even though the officer was a state actor at the scene, "the fact of his peacekeeping presence did not convert the private act of repossession . . . into state repossession action." Id.

The Zittas do not contend Officer Graham physically assisted Waterman in removing the Lull from their property or conspired with Waterman to do so. Neither Officer Graham nor Trooper Glanz threatened to arrest Mrs. Zitta. The Zittas instead claim Officer Graham unlawfully

assisted by giving Waterman permission to drive away with the Lull -- and argue, in essence, that he "assisted" by assessing the situation and finding no probable cause to seize the Lull or arrest Waterman for larceny or trespassing.

First, even viewed in the light most favorable to the Zittas, the evidence does not support a finding that Officer Graham's presence at the scene converted an otherwise private "repossession" into state action. At best, this case lands midway on the Second Circuit's spectrum, concerning "involvement greater than mere presence, yet still insufficient to constitute state action in aid of the repossession." Barrett, 189 F.3d at 302; see Menchaca, 613 F.2d at 510. Officer Graham's presence was not the "critical" factor leading to Waterman's possession of the Lull. If neither party had called the police, the Court finds it very likely Waterman would have taken the Lull anyway. See, e.g., Moore v. Carpenter, 404 F.3d 1043, 1046 (8th Cir. 2005) ("When a police officer is involved in a private party's repossession of property, there is no state action if the officer merely keeps the peace, but there is state action if the officer affirmatively intervenes to aid the repossessor enough that the repossession would not have occurred without the officer's help."). When Officer Graham received the first calls from Waterman and Mrs. Zitta, he was busy processing a driver for DUI. Waterman first told Officer Graham he owned the Lull; Mrs. Zitta said her husband owned it. Waterman had already driven the Lull off the Zittas' property and onto the side of Wes White Hill Road by the time Officer Graham and Trooper Glanz arrived at the scene. (Doc. 32-2 ¶ 23.) Once at the scene, Officer Graham reviewed Waterman's purported bill of sale, examined the Lull's matching serial number, and called the seller of the Lull, Dan Gallant, who stated that Waterman purchased it. Officer Graham asked Mrs. Zitta (and Mr. Zitta via phone) for any documentation of ownership, but they were unable to produce any. At this point, Officer Graham determined the situation was civil, not criminal, in nature, (i.e., he had no probable cause to arrest Waterman or

seize the Lull), told the parties so, and gave Waterman permission to leave with the Lull.  This

decision does not "convert" Waterman's "private act[ion]" into a state-sponsored "repossession" of

the Lull.  Barrett, 189 F.3d at 303.

Second, to the extent the Zittas complain Officer Graham should have charged Waterman

with larceny, trespass, or driving a vehicle exceeding the road's weight limit, see Doc. 38 at 2

(arguing Officer Graham's failure to act is "as much an action as an action itself"), "it is well-settled

that a private citizen does not have a constitutional right to bring a criminal complaint against

another individual."  Chandler v. Carroll, 1:09-cv-58, 2009 WL 2514428, at *5 (D. Vt. Aug. 12, 2009)

(internal quotation marks omitted) (citing cases).  The Zittas do not have a protected constitutional

right in the investigation, arrest, or prosecution of Waterman (or lack thereof).  And, as noted above,

the Vermont State's Attorney Office reviewed the case and declined to press charges.  (Doc. 32-2

¶ 53.)

2.      Officer Graham Is Entitled to Qualified Immunity

In any event, even if Officer Graham's conduct did constitute state action, the Court finds

he is entitled to qualified immunity.  "The doctrine of qualified immunity protects government

officials from liability for civil damages insofar as their conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known."  Stanton v.

Sims, 134 S. Ct. 3, 4 (2013) (internal quotation marks and citation omitted).  It gives officials

"breathing room to make reasonable but mistaken judgments about open legal questions."  Ashcroft

v. al-Kidd, 131 S. Ct. 2074, 2085 (2011); see Zalaski v. City of Hartford, 723 F.3d 382, 388 (2d Cir.

2013).  In other words, qualified immunity, "[w]hen properly applied, protects all but the plainly

incompetent or those who knowingly violate the law."  al-Kidd, 131 S. Ct. at 2085 (internal

quotation marks and citation omitted).

Whether the doctrine applies should normally be determined as early as possible. See

Pearson v. Callahan, 555 U.S. 223, 232 (2009) ("Because qualified immunity is an immunity from

suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to

go to trial." (internal quotation marks omitted)).  Two questions frame a qualified immunity analysis.

Viewing the facts in the light most favorable to the Zittas on summary judgment, the Court must

consider (1) whether the facts show Officer Graham violated the Zittas' constitutional rights, and

(2) whether the right was "clearly established" at the time of Officer Graham's conduct.  Zalaski,

723 F.3d at 388; see Tracy v. Freshwater, 623 F.3d 90, 96 (2d Cir. 2010).  A court may exercise its

discretion in deciding which of the two prongs it should consider first, Pearson, 555 U.S. at 236, and

"[a]nswering either prong in the negative will bar suit against the official."  O'Brien v. Barrows,

1:10-cv-173, 2013 WL 486655, at *5 (D. Vt. Feb. 7, 2013) (citing Pearson).  As determined above,

the Court finds no state action and therefore, Officer Graham did not commit a constitutional

violation.  But even if he did, Officer Graham would still be entitled to dismissal of the case against

him based on the second prong of the qualified immunity analysis.

To determine whether a right was clearly established, a court examines whether "(1) it was

defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the

existence of the right, and (3) a reasonable defendant would have understood that his conduct was

unlawful."  Doninger v. Niehoff, 642 F.3d 334, 345 (2d Cir. 2011).  Although a finding that a right is

clearly established "do[es] not require a case directly on point, [] existing precedent must have placed

the statutory or constitutional question beyond debate."  al-Kidd, 131 S. Ct. at 2083.  "[I]f at least

some reasonable officers in the defendant's position could have believed that [the challenged

conduct] was within the bounds of appropriate police responses, the defendant officer is entitled to

qualified immunity."  Zalaski, 723 F.3d at 389 (internal quotation marks and citation omitted).  In

15

other words, "[t]o be clearly established, [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Winfield v. Trottier, 710 F.3d 49, 53 (2d Cir. 2013) (internal quotation marks and citation omitted).  As long as the conduct was "objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken," qualified immunity applies. Id. (internal quotation marks and citation omitted); see Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (per curiam) ("Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct.").  Finally, "a determination of whether the right at issue was 'clearly established' 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" Doninger, 642 F.3d at 345-46 (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)).

The Zittas do not claim Officer Graham knowingly violated the Constitution and there is no evidence to suggest that he did.  Instead, they argue he "should have known that his actions were outside the scope of his authority."  (Doc. 38 at 14.)  To find qualified immunity does not apply, the Court would have to conclude that Officer Graham's actions -- namely, the decision to permit Waterman to leave with the Lull -- were not "objectively legally reasonable" in light of the existing law. Winfield, 710 F.3d at 53.  Or, as the Supreme Court recently put it, it must find that Officer Graham was "plainly incompetent." Stanton, 134 S. Ct. at 6; see al-Kidd, 563 U.S. at 2085.

This it cannot do.  As a general proposition, the deprivation of a protected property interest without notice and a hearing is undoubtedly a "clearly established" violation of the Fourteenth Amendment.  It is also "clearly established" Second Circuit precedent that an officer's involvement or assistance at a private repossession may, at some point, "take on the character of state action." Barrett, 189 F.3d at 302.  But as noted above, this analysis cannot rely on "broad general

16

proposition[s]." Doninger, 642 F.3d at 345.  The specific point at which an officer's conduct

reaches state action in a private repossession has not been "clearly established," and this makes all

the difference.  See Barrett, 189 F.3d at 302 ("no bright line has been drawn delineating the exact

point at which an officer's presence and activities at the scene of a repossession become state action

in aid of the repossession."); Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 182 (4th Cir. 2009)

("[T]here is no specific formula for determining whether state action is present . . . .  What is fairly

attributable [to the state] is a matter of normative judgment, and the criteria lack rigid simplicity."

(internal quotation marks omitted)).  Other courts addressing the same issue agree.  See, e.g., Pollock

v. Ellingsen, 3:07-cv-0637, 2009 WL 909629, at *2 (N.D.N.Y. Apr. 1, 2009) ("What was not clearly

established is the point at which police action rises to the level of state action . . . . [and] reasonable

officers could disagree whether [the officer's] actions in this case were sufficient to constitute state

action." (applying qualified immunity in repossession case)); Moore v. Carpenter, 404 F.3d 1043,

1046 (8th Cir. 2005) ("The law in this area is particularly fact-sensitive, and complicated . . . .

Because it would not be clear to a reasonable officer that his conduct was unlawful in the situation

confronted here, [the] officers . . . are protected by qualified immunity." (internal citation and

quotation marks omitted)).

It simply would not be clear to a reasonable officer in Officer Graham's situation, with the

information available to him, that determining the situation was a civil matter and allowing

Waterman to leave was "plainly incompetent" or otherwise rose to the point of unlawful conduct.

Stanton, 134 S. Ct. at 6; see Moore, 404 F.3d at 1046 ("The officers were required to make a close

decision in the midst of a repossession fracas and could not have determined they were becoming so

entangled . . . that they could be held liable under § 1983.  The officers had good evidence that [the

repossessor] had an ownership interest in the boat and needed to diffuse the volatile situation, which

necessarily resulted in one of the parties possessing the property when the public peace was restored." (internal citation omitted)).  Even viewed in the light most favorable to the Zittas, Officer Graham's conduct was "objectively legally reasonable in light of the [existing] legal rules."  Winfield, 710 F.3d at 53 (internal quotation marks omitted); see Coollick v. Hughes, 699 F.3d 211, 221 (2d Cir. 2012) ("Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." (internal quotation marks and citation omitted)).  Officer Graham is thus entitled to qualified immunity.  Accordingly, under either the state action or qualified immunity doctrine, his motion for summary judgment is GRANTED.

C.      Chief Buck and the Town of Richmond

First, the Zittas did not address in their opposition to Defendants' motion for summary judgment the Town's argument that the Zittas cannot demonstrate a town policy or custom caused a deprivation of their constitutional rights.  This claim is therefore abandoned.  See Pibouin v. CA, Inc., 867 F. Supp. 2d 315, 325-26 (E.D.N.Y. 2012) (citing cases).  This leaves the Zittas' supervisory liability claim against Chief Buck.

Second, in order for Chief Buck to be liable under § 1983 as a supervisor, Officer Graham must have violated the Zittas' constitutional rights.  Blyden v. Mancusi, 186 F.3d 252, 265 (2d Cir. 1999) ("Of course, for a supervisor to be liable under Section 1983, there must have been an underlying constitutional deprivation.").  As found above, there was no such violation.  Even if there were, Chief Buck would nevertheless be entitled to qualified immunity because "in order for a supervisor to be held liable under section 1983, both the law allegedly violated by the subordinate and the supervisory liability doctrine under which the plaintiff seeks to hold the supervisor liable must be clearly established."  Poe v. Leonard, 282 F.3d 123, 126 (2d Cir. 2002).  As explained above, Officer Graham is entitled to qualified immunity because the point at which an officer's conduct

reaches state action in these circumstances has not been clearly established.  Accordingly, "the law allegedly violated by the subordinate" was not clearly established.  Chief Buck's motion for summary judgment is therefore GRANTED..

IV.    Conclusion

In conclusion, Officer Graham's conduct did not constitute state action and thus did not deprive the Zittas of their due process rights under the Fourteenth Amendment.  Chief Buck cannot be liable as a supervisor under § 1983 because the Court has found no underlying constitutional deprivation.  And in any event, both Officer Graham and Chief Buck are entitled to qualified immunity for the reasons stated above.  Defendants' motions for summary judgment (Docs. 32, 33) are GRANTED and this action is DISMISSED.

SO ORDERED.

Dated at Brattleboro, in the District of Vermont, this 24th day of January, 2014.

/s/ J. Garvan Murtha
Honorable J. Garvan Murtha
United States District Judge